George V. McNally, Respondent, *v*. 301 Madison Avenue Corporation, Appellant.

First Department, July 6, 1925.

Brokers — real estate brokers — action to recover commissions for procuring person ready, able and willing to make lease — testimony shows that only few terms of lease were agreed on and that plaintiff's offer was received for consideration — instructions — error to refuse to charge rule concerning self-serving letter introduced by plaintiff without objection — fact that no objection was made did not preclude defendant from having instruction.

In an action by a real estate broker to recover commissions alleged to have been earned by producing a person ready, able and willing to make a lease of defendant's building, in which it appears that only a few of the terms of the lease were agreed upon and from defendant's testimony that the offer by the plaintiff was received for consideration and for further discussion as to terms, the plaintiff introduced, without objection, a letter written by him to the defendant in which there was a self-serving declaration to the effect that the defendant had accepted the lease offered by the plaintiff. It was error for the court to refuse to charge that the letter must be regarded as a self-serving letter, since it was written by the plaintiff in his own behalf, and it was error for the court to charge, in effect, that said self-serving declaration might be admissible provided it was written in good faith and rehearsed the true facts.

The fact that the defendant did not object to the admission of the letter in evidence did not thereby preclude it from having the jury correctly instructed as to the character of such evidence according to the established rules of law.

Appeal by the defendant, 301 Madison Avenue Corporation, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 12th day of April, 1924, upon the verdict of a jury, and also from an order entered in said clerk's office on the 11th day of April, 1924, as resettled by an order entered in said clerk's office on the 6th day of May, 1924, denying defendant's motion for a new trial made upon the minutes.

*Laughlin, Gerard, Bowers & Halpin [Stewart W. Bowers of counsel],* for the appellant.

*Julian T. Abeles,* for the respondent.

FINCH, J.:

This is an action by a broker to recover commissions on the making of an alleged lease. The defendant owned certain premises which it desired to sell. In order to facilitate the sale, the defendant sought to lease the premises to a responsible going concern which would occupy the premises under a long lease and would, therefore, make the property available as an investment. The plaintiff claims to have found a lessee ready, able and willing to make such a lease. The substance of the testimony of the plaintiff is as follows: " Q. Please state to the jury what transpired on September 6th, 1921, and where? A. On September 6th, 1921, in Mr. Taylor's office, with Mr. Farrington and other officers of the 301 Madison Avenue Corporation, we consummated the transaction we had been negotiating for some time, on the basis of leasing the building 301 Madison Avenue for a term of 21 years, the rental to be $14,000 the first seven years, $15,000 for the next seven years, and $16,000 for the last seven years, with the understanding that there was to be six months free rent allowed for the purpose of constructing the new building. The people that were taking the lease were to erect a new building. They were to furnish Mr. Taylor with a surety company bond so as to protect Mr. Taylor in the matter of the building and all the terms of these negotiations were settled on there with Mr. Williams of my office, Mr. Taylor and Mr. Farrington. Mr. Lewis: I object to the words ' settled on.' I have [*sic*] to strike out his answer in so far as the conclusions in it are concerned. Mr. Abeles: I consent. Q. Anything else said at that time that you recall? A. Yes, Mr. Taylor says, ' What is this job going to cost me? ' I said, ' You mean the commission? The regular commission,' I said, ' it is 1½ per cent on the first $200,000 aggregate and 1 per cent over that,' and I figured the commission for him and we shook hands on it and left the office. Q. Did you mention at that time the names of the tenants, and if so, what did you say? A. I mentioned the names of the tenants two or three times. I told him they were taking the lease under the name of the 141 West 36th Street Company — Mr. Frank Sinnot and Mr. Aaron. Mr. Frank Sinnot and Mr. Aaron were to erect this building and put all the money into it and finance it. The Court: Was that the conversation? The Witness: Yes, I explained the whole thing in detail to Mr. Taylor. Q. Did he make any remark when you mentioned who the parties were, that

were to finance the proposition?   A. Yes, he said, ' I know Sinnot.'
Q. What was the last remark he made to you that day that you
recall, Mr. McNally?   A. The last remark he made to me, the last
remark made — he said to Mr. Williams and myself, ' Go to Mr.
Kilpatrick for the lease.'   He says: ' Mr. Kilpatrick is a relative
of my wife's.   Q. You have never been paid any part of this com-
mission, Mr. McNally?   A. No, I have not.   Q. As I understand
it, Mr. Williams subsequently saw Mr. Kilpatrick?   A. Mr.
Williams saw Mr. Kilpatrick the next day."

Samuel Williams, who was associated with the plaintiff in the
transaction, testified as follows: " Q. What did you say?   Did Mr.
McNally do most of the talking?   A. I told Mr. Farrington that
we would take the property at $14,000 for seven years — $15,000
for seven and $16,000 for seven years, six months rent free, and the
tenant to put up a new building.   Q. Was the height of the build-
ing mentioned?   A. Six stories, I think six or seven stories.   It is
three years ago now.   Q. Did you confirm that in writing on the
following day?   A. On the following day.   Q. Mr. Williams, what
was the last thing said by Mr. Taylor on that day or by Mr. Far-
rington?   A. To see Mr. Kilpatrick for a lease.   Q. You had seen
him from time to time in regard to this matter since August, hadn't
you?   A. Mr. Taylor and Mr. Farrington.   Q. And they had made
you propositions, as I understand it, and you had made them
propositions?   A. Counter propositions.   Q. Did he tell you at
that time the terms you stated were satisfactory?   A. Satisfactory
and congratulated us."

On behalf of the defendant Mr. Taylor testified: " It had been
very firmly impressed upon me that in order to sell the property,
which I wanted to do, it was of the utmost importance that I
obtain a tenant who would be free from criticism in any way, that
he should occupy the premises himself and should thoroughly satisfy
any prospective purchaser of the property.   So I made that clear
to Mr. McNally and asked him to bear that in mind in looking up
a possible tenant.   *   *   *   Q. Was anything said to Mr. McNally
about Mr. Kilpatrick?   ᐟA. Yes, it was explained to him, he was a
relative of mine and I was guided absolutely by his advice in any
real estate transactions I went into, that I felt his judgment was
very good in such matters and I would never consider making any
serious move or important move in connection with a real estate
transaction without having him approve it first.   *   *   *   Q.
Mr. Taylor, you have heard Mr. McNally's testimony?   A. Yes.
Q. As to what took place on September sixth in your office.   Did
Mr. McNally come to your office and did such an interview take
place?   A. I believe so.   Q. Tell what was said by you and by Mr.

McNally on that occasion. A. I cannot quote the conversation verbatim, but the offer was made by him for the property, was listened to on the basis that it would be considered, and he was referred to Mr. Kilpatrick with relation to the matter, and no definite answer was given him either one way or the other. Q. So that Mr. McNally is exaggerating when he says that you shook hands and called the deal closed and said this matter was all finished? A. Yes. * * * Q. Mr. Taylor, are there any other terms to be agreed upon besides just rent, the height of the building, who is to pay the taxes and the first six months' rent free? A. Yes, there are. * * * The question of the character of the tenant would have to be considered and the fact he would have to occupy the premises himself, would have to qualify on the basis of his financial responsibility; * * * who was to write the bond, * * * and the effect of failure to pay taxes, giving the landlord a right to dispossess. * * * Q. Did you refer Mr. McNally to Mr. Kilpatrick for the further terms? A. Yes, sir. Q. And for the question of whether this tenant was responsible? A. Yes. * * * Q. And suitable? A. Yes. * * * Q. Was it clearly explained that this was merely an offer which you received from them, to be considered? A. Yes."

This version of the transaction was corroborated by the testimony of Farrington, another officer of the defendant, who was present at the time.

It appears that Mr. Williams called the next day to see Mr. Kilpatrick, thus acquiescing in the contention of the defendant, since by going to see another layman this obviously was for the purpose of taking up with him the full details of the offer and seeking to arrive at an agreement thereon. Williams' explanation that he expected Kilpatrick, who was not a lawyer, to hand out a completely drawn lease when only a portion of the terms had already been agreed upon, as an explanation of his conduct in going to see Kilpatrick, not only does not explain, but goes a long way to corroborate the defendant's contention.

The reason for Mr. Kilpatrick's refusing to go on with the lease is in dispute, Mr. Kilpatrick on his part claiming that he had ascertained that the corporation which was to lease the property was composed of two speculators who did considerable speculating in leaseholds, whereby they subleased at a profit either before or after leasing from the owner and with no intention of occupying the building themselves; and that, therefore, the proposed tenant did not in any way meet the requirements of the defendant, and that they were promptly rejected on that ground. It does appear that these operators claimed that they were going to occupy an

office in the building, but obviously this was far different from an established business which would use the building primarily for their own occupancy. Williams, on his part, claims that Kilpatrick rejected the lease because he could get more money. An answer to this would seem to be that it appears without dispute that the premises were not finally disposed of by the defendants until about six months later, which would negative Williams' contention in so far as it implies that Kilpatrick rejected because he had a higher offer. However, whatever may have been the reason for the rejection, the plaintiff seeks to rely on the testimony of himself and Williams to establish that he had found a lessee who was ready, able and willing to make a long lease for twenty-one years with two renewals. The whole issue in the case turns narrowly on the question whether there was a verbal acquiescence by the defendant in the incomplete terms given and thereby a disregard of all of the other provisions of the lease, as distinguished from a willingness, as contended for by the defendant, to consider the terms offered. It is conceded that the parties themselves were never brought together by the broker. Such a transaction requires an agreement on a vast number of provisions, and the testimony introduced on behalf of the plaintiff failed to show that such an agreement had been reached. Nowhere does the record show the terms upon which the lease was to be made, as set forth by the plaintiff in his complaint; but the plaintiff is evidently relying on an obviously incomplete offer, without showing an agreement on the terms not mentioned. As noted in his testimony, the plaintiff distinctly specified his offer as for a term of twenty-one years, and named rental for each of the seven-year periods of said term, provided for six months' rent free while the lessees were erecting the new building, and agreed to furnish a surety company bond. Williams, on his part, was very emphatic that these were the only terms mentioned. In answer to the court's question to " state them again," Williams replied: " $14,000 for seven years; $15,000 for seven years; and $16,000 for seven years; six months free rent, and the tenant to erect a six or a seven-story building. The Court: Those were the only terms mentioned? The Witness: Yes, the only terms mentioned." Nothing is said at all as to what kind of a building was to be put up on the site, except a six- or seven-story building. The right to approve the plans would be a right vital to the defendant, since if the lessee failed to complete the building, the defendant would have to finish it if the surety declined to do so, and then seek to hold the surety for the damage; and this had been specifically called to the plaintiff's attention. In connection with another offer, the defendant had written the plaintiff:

" * * * but it will not be satisfactory to us to loan the tenant $30,000 as suggested in your letter unless they finance a new building covering the full depth of the lot, seven stories high, of such a character as to be readily rented by us at any time should the necessity arise. In other words, we would have to approve the plans."

Many other details suggest themselves, and there is no attempt by the plaintiff to show that the lessee was willing and ready to agree to any of these additional terms or that the defendant waived all except the skeleton outlined by the plaintiff in his testimony. In fact, there is evidence in the record that the plaintiff had written notice from the president of the defendant that such a lease could not be considered closed until the negotiations were completed. On August 11, 1921, Mr. Alex Taylor wrote to Mr. McNally as follows: " I acknowledge receipt of your telephone message of this morning, and in reply would say that I do not consider this matter closed until negotiations are actually completed; meanwhile the property is still to be offered as heretofore."

The testimony in behalf of the plaintiff is entirely consistent with the probabilities that the broker was turned over to Mr. Kilpatrick, who was a relative of Taylor's wife, and conversant with real estate matters, and who, with the broker, would work out the details of the lease. This is borne out by the fact that Mr. Kilpatrick was not a lawyer and that the details would have to be agreed upon before the matter could be turned over to a lawyer to draw up the lease. Upon this state of the record the plaintiff, evidently feeling the weakness of his position, in collaboration with Mr. Williams, wrote a self-serving declaration to bolster up his case. Although Williams could not recall whether the building to be erected on the premises by the lessee was to be six or seven stories high, because of the length of time which had elapsed, yet he recalled distinctly writing out this letter and stamping and mailing it himself by depositing it in the mail chute on the eleventh floor of the Canadian Pacific Building. This letter reads as follows:

" The offer I made you yesterday for 301 Madison Avenue is the one that you and Mr. Farrington said you would accept, but for your information I herewith submit it again in writing.

" The lease to be for a term of 21 years with two renewals. Rental for the first 7 years to be $14,000 net per annum, for the second 7 years $15,000 net per annum and for the last 7 years, $16,000 net per annum, making an average rental of $15,000 net. The 301 Madison Avenue Company is to allow the tenant six months rent from date of signing of the lease for the completion of a new six story and basement building to cost not less than

$60,000. The tenant is to pay the taxes due November 1st. The name of the prospective tenant is the 141 West 36th Street Company and you will be amply secured by a satisfactory bond guaranteeing completion of the building.

" It is important that this matter should be closed at once as it is with great difficulty that we have been holding these people in line throughout the summer."

It is to be noted that this letter of September seventh differs from the offer, as testified to by both the plaintiff and Williams, in one important aspect, namely, that their testimony concerns only a lease for twenty-one years, while the letter concerns a lease for twenty-one years with two renewals. That such a letter relating to a past transaction is self-serving admits of no doubt. In the words of PECKHAM, J., in *Bank of British North America* v. *Delafield* (126 N. Y. 410, 418): " We can see no ground upon which the letter is admissible. It is not in the nature of a declaration which the defendant admits by not answering, nor is it on the same plane as an oral declaration to the same effect, made in the presence of the party to be charged and who may be regarded as admitting its truth by failing to deny it. This letter is a mere declaration of the writer assuming in his own behalf to characterize and determine the nature of a past transaction, and it does not demand an answer and is not admissible in evidence against the defendant."

Upon so close a question of fact, the letter of September seventh assumed a large importance. While this letter was admitted without objection, yet the defendant asked the court to charge: " I ask your Honor to charge the jury that the letter of September 7th must be regarded by this jury as a self-serving letter, since it was written by the plaintiff in his own behalf." This request was refused, and the court, instead, charged as follows: " You have a right to ask yourselves, did Mr. Taylor actually say these words as stated by the plaintiff in his letter to the defendant, ' That you and Mr. Farrington said you would accept,' etc., or did the plaintiff write this letter to make it appear that he had accepted? * * * You must distinguish between what was said as really and truthfully portraying the events at that time and what may be said for the purpose of making it appear in a letter or otherwise, that what was said therein really and truly portrays the event or the statement or the conversation. * * * If you find that Mr. McNally wrote that letter in good faith, and that he really was rehearsing what was true in referring to what had transpired the day before, and if Mr. Farrington and Mr. Taylor had accepted the tenant, why that is the end of the case and the plaintiff is entitled to his commissions."

Thus, in effect, the jury were instructed that a self-serving

declaration might be admissible, provided it was written in good faith and rehearsed the true facts. This was error.

Even though the letter was admitted in evidence without objection, the defendant was not thereby precluded from having the jury correctly instructed as to the character of such evidence according to established rules of law. As was said in *Holmes* v. *Moffat* (120 N. Y. 159, 163): "It has been established by well-considered authority in this State that when evidence is admitted upon a trial by jury, either without an exception, or properly under objection, which, for any reason, should not be considered by the jury, it is not error for the court to refuse to strike it out. The remedy of the party is to ask the court to instruct the jury to disregard it."

Where a case presented such a closely contested issue of fact, as appears here, it cannot be said that the result of the trial was uninfluenced by the failure to instruct the jury as to the character of the letter referred to.

It follows that the judgment and order should be reversed and a new trial ordered, with costs to the appellant to abide the event.

DOWLING, MCAVOY, MARTIN and BURR, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to the appellant to abide event.